Filed 9/15/15  P. v. Mendivil CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D065515 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. JCF27253) |
| LAWRENCE DANIEL MENDIVIL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Imperial County, Raymond A. Cota, Judge.  Affirmed.

Laurel M. Nelson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Brendon W. Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

Lawrence Daniel Mendivil appeals a judgment following his jury conviction of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1))[1] and the jury's true findings he committed that offense for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)) and personally inflicted great bodily injury (GBI) on the victim (§ 12022.7, subd. (a)). On appeal, Mendivil contends: (1) the evidence is insufficient to support his conviction for assault with a deadly weapon and the jury's true finding on the GBI allegation; (2) the court erred by discharging a juror; (3) the court erred by admitting evidence on his codefendant's jail telephone call and his codefendant's prior conviction; (4) the court erred by denying his postverdict motion for a continuance to allow his defense counsel to investigate possible juror misconduct; and (5) if he forfeited any of the above contentions by not timely objecting, he was denied effective assistance of counsel.

FACTUAL AND PROCEDURAL BACKGROUND

In May 2011, Alonso Pineda lived in a Brawley home with his girlfriend, Diane Verdusco (Diane), her son, Mark Verdusco (Mark), Mark's girlfriend, Monique Arellano (Monique), and Diane's ex-husband, Richard Pacheco. Mark was an associate of a Brawley criminal street gang known as "Brole." Monique was associated with a rival Calexico criminal street gang known as "Calexia." Their Brawley home was located within territory claimed by Brole.

---

[1] All statutory references are to the Penal Code unless otherwise specified.

2

At about 3:00 p.m. on May 11, Monique was in the front yard of her home when Vanessa Miranda (also known as "Guera" or "Guerra," her gang moniker) and Vanessa Mendoza (also known as "Terca," her gang moniker) confronted her and told her she was disrespectful of the Brole gang because she was affiliated with Calexia and had a relationship with Mark, a Brole associate. The three women, followed by Diane, walked to the backyard where Monique and Mendoza began fighting. Hearing the fight, Pacheco attempted to separate the women. Miranda punched Pacheco and helped Mendoza fight Monique. When Diane pushed Miranda away from Monique, Diane and Miranda began fighting. Pacheco separated the women and was able to end the fight. As Mendoza and Miranda left, Mendoza yelled that she and Miranda would go get back-up and finish the fight.

At about 10:15 p.m., Diane and Monique were in the front yard when two cars passed them and parked nearby. About 10 people got out of the cars and began shouting profanities and "Brole, Brole. This is my hood. Better respect." The group, including Miranda, Mendoza, Marie Hernandez (also known as "Cuca," her gang moniker), Raymond Quezada (also known as "Spider," his gang moniker), and Mendivil (also known as "Low Low," his gang moniker), approached the front yard. Some of the group members pulled Diane from the front yard by her hair and she fell onto the street. She was then punched and kicked in the face. Monique punched Miranda to get her away from Diane. Pineda came out of the house, saw Diane lying on the street, and tried to pick her up. Mendivil and Quezada pulled out pocket knives and stabbed Pineda. When

3

someone yelled, "I'm calling the cops," the group's members, including Mendivil and Quezada, ran to the cars and drove away.

Veronica Castellano, a neighbor, was outside her home when the fight occurred. She saw a group of people approach Pineda's home, yelling profanities and "Brole." She went inside her home, called 911, and remained inside until police arrived.

Shortly thereafter, police and emergency medical personnel arrived at the scene. Pineda was taken to the hospital. He had five stab wounds, a collapsed lung, and a fractured rib. Diane's eyes and face were swollen, her nose was bleeding, and her forehead and lips had marks on them. Monique had bruises and marks on her face.

An amended information charged Mendivil and Quezada with the willful, deliberate, and premeditated attempted murder of Pineda (§§ 664, 187, subd. (a)) and assault with a deadly weapon on Pineda (§ 245, subd. (a)(1)). It alleged they committed those offenses for the benefit of, at the direction of, and in association with a criminal street gang within the meaning of section 186.22, subdivision (b)(1), and that in committing the assault they personally inflicted great bodily injury on Pineda (§ 12022.7, subd. (a)).

At the joint trial of Mendivil and Quezada, the prosecution presented testimony substantially as described above. Brawley Police Detective Christian Romualdo testified regarding statements made to him by eyewitnesses after the incident. Jeffrey Glaze, a neighbor, told him two Hispanic males attacked Pineda and the others. One was tall with tattoos on his head, and the other was short. Romualdo also testified as a gang expert that in a hypothetical situation similar to the facts in this case, the gang members would have

4

committed the charged offenses for the benefit of the Brole criminal street gang. He also testified regarding a telephone conversation between Quezada and Ernesto Barraza recorded while Quezada was in jail after his arrest.

Many of the eyewitnesses testified inconsistently with the statements they made to Romualdo after the incident. Diane testified she did not recognize anyone that night and did not recall hearing any yelling. She could not tell who pulled her and kicked her. She did not see any weapons. Monique admitted getting into a fight with a female that day, but did not know who the female was. She was not in a fight later that evening. Pineda testified he returned home from a store, placed beer in the refrigerator, and then saw Diane lying on the street. There were three people standing about six feet away from Diane. When he stooped over to pick Diane up, he was struck on his back. The next thing he remembered was waking up in a hospital. He could not recall photographs being taken of his stab wounds. Castellano testified she saw a group of people walking down the street, but did not hear anyone yelling, "Brole, Brole." Glaze testified that from inside his home he saw a group of females, but did not recall hearing anyone saying, "Brole." One of the females knocked Diane down and the other started kicking and hitting her. Glaze testified that as Pineda stepped toward Diane, one of the females hit him and two more females "piled on him." Glaze went outside to help get the attackers off Pineda. After he pulled two females off of Pineda, Glaze saw two Hispanic males out by the street. One was short and the other was tall. He later identified Mendivil as probably the shorter male he saw that night and Quezada was probably the taller male. Glaze testified neither of the two males could have stabbed Pineda.

5

In his defense, Quezada presented the testimony of Miranda, Mendoza, and Hernandez that they went back to Diane's house to ask her for money they had given her for drugs she did not deliver to them. A fight broke out and Diane pulled out a pocket knife. They testified neither Quezada nor Mendivil were present when Pineda was attacked. They did not know who stabbed Pineda.

Miranda testified she was no longer a Brole member, but still associated with Brole members. Her boyfriend is a Brole associate and Quezada's friend. Hernandez testified she was no longer a Brole member, but still associated with Brole members. She was Quezada's former girlfriend.

In rebuttal, Brawley Police Officer Stephanie Zamora testified Monique told her that Mendivil and Quezada began to punch Diane and, when she tried to help Diane, Mendivil and Hernandez punched her (Monique). Monique told Zamora she heard the snap of a pocket knife being extended and then saw Mendivil and Quezada with knives in their hands. When Pineda tried to break up the fight, Mendivil and Quezada attacked him. However, she did not see who stabbed Pineda.

The jury found Mendivil not guilty of attempted premeditated murder and guilty of assault with a deadly weapon. It found true allegations he committed the assault for the benefit of, at the direction of, or in association with a criminal street gang, and that in committing that offense he personally inflicted GBI on Pineda. The trial court sentenced Mendivil to the upper term of four years for the assault conviction, a consecutive 10-year term for the gang enhancement, and imposed, but stayed execution of, a three-year term

6

for the GBI enhancement, for a total term of 14 years in prison. Mendivil timely filed a notice of appeal.

DISCUSSION

I

*Substantial Evidence to Support Assault with a Deadly Weapon
Conviction and True Finding on GBI Allegation*

Mendivil contends the evidence is insufficient to support his conviction for assault with a deadly weapon and the jury's true finding on the GBI allegation. He argues that although Pineda was stabbed by someone with a knife, the evidence is insufficient to support a finding by the jury that he committed that assault with a deadly weapon.

A

When a defendant challenges a criminal conviction on appeal based on a claim of insufficiency of the evidence, "the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence--that is, evidence that is reasonable, credible, and of solid value--such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11, citing *People v. Johnson* (1980) 26 Cal.3d 557, 578.) "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

7

The substantial evidence standard of review involves two steps. "First, one must resolve all explicit conflicts in the evidence in favor of the respondent and presume in favor of the judgment all *reasonable* inferences. [Citation.] Second, one must determine whether the evidence thus marshaled is substantial. While it is commonly stated that our 'power' begins and ends with a determination that there is substantial evidence [citation], this does not mean we must blindly seize any evidence in support of the respondent in order to affirm the judgment. . . . [Citation.] '[I]f the word "substantial" [is to mean] anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with "any" evidence. It must be reasonable . . . , credible, and of solid value . . . .' [Citation.] The ultimate determination is whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record." (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1632-1633, fns. omitted.) "[T]he power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. *If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion*." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.)

The standard of review is the same in cases in which the prosecution relied primarily on circumstantial evidence. (*People v. Bean* (1988) 46 Cal.3d 919, 932.) In

8

applying the substantial evidence standard of review to cases primarily involving circumstantial evidence, *Bean* stated: "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*Id*. at pp. 932-933.) "Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt." (*People v. Pierce* (1979) 24 Cal.3d 199, 210.)

B

Based on our review of the record, we conclude there is substantial evidence to support Mendivil's conviction for assault with a deadly weapon and that it was Mendivil who committed an assault with a deadly weapon against Pineda. To prove the offense of assault with a deadly weapon, the prosecution must prove beyond a reasonable doubt that the defendant (1) willfully committed an act that by its nature would probably and directly result in the application of physical force to another person; (2) he or she was aware of facts that would lead a reasonable person to realize that as a direct, natural, and probable result of that act, physical force would be applied to another person; (3) he or she had the present ability to apply physical force to another person; and (4) he or she used a deadly weapon in the assault. (CALCRIM No. 875; *People v. Miller* (2008) 164

9

Cal.App.4th 653, 662; *People v. Golde* (2008) 163 Cal.App.4th 101, 108-109.) However, the prosecution need not prove the defendant actually intended to use force against someone when he or she acted or intended to cause injury to another person. (CALCRIM No. 875; *Miller*, at p. 662; *Golde*, at pp. 108-109.)

The record contains substantial evidence to support a finding by the jury that Mendivil committed an assault with a deadly weapon on Pineda. According to Romualdo's testimony, several percipient witnesses identified Mendivil as one of the two men who stabbed Pineda with a knife. Soon after the incident, Diane and Monique told police that Mendivil, Quezada, Miranda, Mendoza, and Hernandez approached their home. They stated they saw Mendivil and Quezada stab Pineda and then flee. When presented with a six-pack photographic lineup and asked if she recognized Pineda's attackers, Diane identified Mendivil and Quezada as his attackers. Similarly, Pineda described his attackers as two Hispanic males and when presented with a six-pack photographic lineup, he pointed at a photograph of Mendivil and stated, "he attacked me, he stabbed me." Romualdo's testimony regarding those statements made by percipient witnesses is substantial evidence to support a finding that Mendivil stabbed Pineda with a knife and, in so doing, committed the offense of assault with a deadly weapon.

Contrary to Mendivil's assertion, the fact that many, if not all, of the percipient witnesses testified inconsistently with their statements to Romualdo and testified they did not see Mendivil commit the assault does not show the evidence is insufficient to support his conviction of assault with a deadly weapon. To the extent he cites and relies solely on the trial testimony of the percipient witnesses who testified they did not recall seeing

10

Mendivil stab Pineda, he misconstrues and/or misapplies the substantial evidence standard of review. In reviewing the sufficiency of the evidence, we consider all of the evidence admitted at trial and do not reweigh the evidence or make inferences contrary to those made by the jury. Furthermore, the percipient witnesses' trial testimony did not make their prior statements to Romualdo inherently improbable, unreliable, or incredible. Rather, their statements to Romualdo, to which he testified at trial, constituted substantial evidence to support the jury's finding that Mendivil, and not some unidentified perpetrator, committed the assault with a deadly weapon on Pineda. "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*People v. Young*, *supra*, 34 Cal.4th at p. 1181.) The jury could reasonably infer that the statements made by the percipient witnesses soon after the incident were more credible than their inconsistent testimony at trial, which inconsistent testimony may have been the result of their fear (e.g., possible threats of retaliation). The fact that no physical evidence (e.g., the knife used to stab Pineda) was found by police tying Mendivil to the assault does not show he did not, in fact, use a knife to stab Pineda. Mendivil has not carried his burden on appeal to show the evidence is insufficient to support his conviction for assault with a deadly weapon.

C

Based on our review of the record, we conclude there is substantial evidence to support the jury's true finding that in committing the assault, Mendivil personally

11

inflicted great bodily injury on Pineda within the meaning of section 12022.7, subdivision (a). Contrary to Mendivil's assertion, there is substantial evidence to support the jury's finding that he, and not some unidentified perpetrator, stabbed Pineda with a knife. As discussed above, both Diane and Pineda identified a photograph of Mendivil to Romualdo as showing one of his attackers. Accordingly, Romualdo's testimony regarding their statements, as well as his testimony regarding the statements of other percipient witnesses, is substantial evidence that Mendivil personally inflicted great bodily injury on Pineda while committing the offense of assault with a deadly weapon. The fact that those percipient witnesses testified inconsistently with their statements to Romualdo does not show their statements were inherently improbable, unreliable, or incredible. Mendivil has not carried his burden on appeal to show the evidence is insufficient to support the jury's true finding on the allegation he personally inflicted GBI on Pineda while committing the assault on him.

## II

### *Discharge of Juror*

Mendivil contends the trial court erred by discharging a juror without good cause.

### A

During trial, the trial court addressed one of the jurors in the presence of the entire jury. The following dialogue occurred between the court and juror number one:

> "THE COURT: . . . [¶] It appears that one of you has been violating my instructions, [Juror No. 1] -- You are [Juror No. 1']?
>
> "JUROR: Yes.

12

"THE COURT:  You've been going on Facebook, sir, apparently, and discussing this case.

"JUROR:  Not on Facebook.  I just posted I was going on jury duty.

"THE COURT:  Pardon me?

"JUROR:  Going to jury duty.  Going to jury duty.  That's what I put.

"THE COURT:  Sir, I have them right here.  And let me remind you of two things:  every once in a while, I try [to] remember to tell everyone, please do not discuss this case with anyone.  And also, I will read a portion of my instructions to you that I gave you at the beginning of this case: [¶] 'Do not use the internet in any way in connection with this case.'

"Now, [Juror No. 1], we have spent three weeks picking this jury to try to see if we could put together a jury that could be fair and impartial . . . to all of the parties and the witnesses, but to follow my instructions.

"And *here you are talking about this case and about the jury, and about other people, you know, telling you things*.

"[Juror No. 1], I cannot believe that you have violated this instruction. [¶] You are excused."  (Italics added.)

After that juror left the courtroom, the court replaced the excused juror with an alternate juror.

## B

Section 1089 provides for the discharge of a juror if the juror on "good cause shown to the court is found to be unable to perform his or her duty."  When a trial court is on notice that good cause to discharge a juror may exist, the court must " ' " 'make whatever inquiry is reasonably necessary' to determine whether the juror should be discharged." ' "  (*People v. Martinez* (2010) 47 Cal.4th 911, 941.)  The California

13

Supreme Court has stated: "[A] juror's inability to perform as a juror must be shown as a 'demonstrable reality' [citation], which requires a 'stronger evidentiary showing than mere substantial evidence' [citation]. . . . 'To dispel any lingering uncertainty, we explicitly hold that the more stringent demonstrable reality standard is to be applied in review of juror removal cases. That heightened standard more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury.' " (*People v. Wilson* (2008) 44 Cal.4th 758, 821.) "Under the demonstrable reality standard, . . . the reviewing court must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1053.)

In *People v. Daniels* (1991) 52 Cal.3d 815, the court held a juror may be removed for "serious and willful misconduct." (*Id*. at p. 864.) In that case, the trial court discharged a juror who, in violation of the court's instructions, read a newspaper article about the case, discussed the case with nonjurors, and expressed an opinion on the defendant's guilt before jury deliberations. (*Id*. at p. 863.) The California Supreme Court concluded that misconduct showed the juror was unable to perform his duty, which "duty includes the obligation to follow the instructions of the court, and *a judge may reasonably conclude that a juror who has violated instructions to refrain from discussing the case* or reading newspaper accounts of the trial *cannot be counted on to follow instructions in the future*." (*Id*. at p. 865, italics added.) *Daniels* upheld the trial court's discharge of the juror. (*Id*. at p. 866; see *People v. Ledesma* (2006) 39 Cal.4th 641, 743

14

[juror who discussed case with his wife could not be counted on to follow instructions in the future and was therefore unable to perform his duties as a juror].)

C

Assuming arguendo Mendivil did not forfeit his challenge to the trial court's discharge of the juror by not objecting below, we conclude the trial court properly found the juror was unable to perform as a juror within the meaning of section 1089.[2] The record on appeal reflects a demonstrable reality that the juror was unable to perform. In the presence of counsel, the court questioned the juror about his purported misconduct, giving the juror an opportunity to answer its questions and otherwise respond to the assertion that the juror had discussed the case on the internet. After the juror denied discussing the case and attempted to minimize his actions by claiming he only stated he was "going on jury duty," the court stated, "I have them right here," presumably indicating it had the juror's actual Facebook or other internet postings before it. The court described those internet postings, stating, "here you are talking about this case and about the jury, and about other people, you know, telling you things." Those internet postings by the juror showed he had violated the trial court's prior instructions not to discuss the case with others and not to use the internet in connection with the case. Based on those violations of its instructions, the court could reasonably find the juror could not

---

[2]     Because we assume arguendo Mendivil did not forfeit his challenge to the court's discharge of the juror, we need not address his claim of ineffective assistance of counsel. Instead, we address the merits of his contention that the court erred by discharging the juror.

15

be counted on to follow its instructions in the future and was therefore unable to perform his duties as a juror. (Cf. *People v. Daniels*, *supra*, 52 Cal.3d at pp. 863-865; *People v. Ledesma*, *supra*, 39 Cal.4th at p. 743.) Because the juror's inability to perform was shown on the record as a demonstrable reality, the trial court properly discharged the juror. (*People v. Wilson*, *supra*, 44 Cal.4th at p. 821.)

Contrary to Mendivil's assertion, the trial court was not required to state on the record the actual Facebook or other internet postings that the juror made to find the juror was unable to perform. Rather than state on the record the juror's actual postings, the court described the types of postings he made. We presume the trial court and both counsel had the juror's actual postings before them when the court addressed his purported misconduct. Therefore, if the court had inaccurately described those postings, we presume Mendivil's counsel and/or the prosecutor would have corrected the court. Absent any affirmative showing on the record to the contrary, we presume the court accurately described the juror's postings.

Furthermore, contrary to Mendivil's apparent assertion, the record does not show the juror posted on Facebook only that he was "going on jury duty." Although that is what the juror represented to the trial court, it corrected him by describing his actual postings (i.e., "here you are talking about this case and about the jury, and about other people, you know, telling you things"). Accordingly, the record shows a demonstrable reality that the juror was unable to perform his duty as a juror. Moreover, contrary to Mendivil's assertion, the court did, in fact, conduct a hearing, albeit a brief one, addressing the issue of the juror's purported misconduct before it found he committed

16

such misconduct and was unable to perform. *People v. Cleveland* (2001) 25 Cal.4th 466, cited by Mendivil, is factually inapposite to this case and does not persuade us to reach a contrary conclusion.

Finally, the fact that the court handled other instances of purported juror misconduct differently from this instance does not show the court abused its discretion or otherwise erred in discharging the juror here. Rather, our review of the record regarding those other instances shows they were inapposite to this one and did not involve a juror's disregard of the court's instructions not to discuss the case with others and not to use the internet regarding this case.

### III

### *Admission of Evidence of Codefendant's*
### *Jail Telephone Call and Prior Conviction*

Mendivil contends the trial court erred by admitting evidence of a jail telephone call and prior conviction of Quezada (his codefendant).

### A

*Quezada's jail telephone call*. Before trial, the prosecution filed an in limine motion for admission of a recorded jail telephone call made by Quezada after his arrest in this case. The call was made by Quezada to Ernesto Barraza, a Brole gang member, and, according to the prosecution, discussed dissuading Pineda, Diane, and Monique from testifying at trial. The prosecution argued the call was relevant to prove Quezada's identity and guilt and to explain any inconsistencies between the trial testimony of Pineda and other percipient witnesses and their prior statements.

17

At the hearing on the motion, the prosecution argued Romualdo would testify as a gang expert to "decode" the substance of Quezada's call. Romualdo would testify that Quezada asked Barraza to facilitate the intimidation of Diane and Monique, and that witness intimidation is common in gang culture. Quezada's counsel objected to admission of his client's telephone call, arguing its language was so vague and ambiguous that it would be prejudicial for a gang expert to testify that witness intimidation was discussed. He also argued the call had no probative value in proving the offenses charged against Quezada. Mendivil's counsel submitted on the issue without argument.

After hearing arguments of counsel, the trial court decided it would conduct an Evidence Code section 402 hearing before ruling on the prosecution's motion. At that subsequent hearing, the court heard the recording of Quezada's call and Romualdo's testimony about it. Romualdo testified he could tell it was Quezada who made the call because he (Quezada) identified himself by his gang moniker, "Spider," and stated the date on which his trial in this case was to begin. He was also able to identify Barraza as the recipient of the call based on his prior contacts with Barraza. Quezada stated: "My trial starts November first, the victim ain't seen shit, and then them, those two people, the *girls*, they already changed their story like three times, fool, so I got it beat. And the homie Vinnie . . . was right here, right? He went home." Romualdo testified that during the call Quezada asked Barraza to tell "Vinnie," who he believed was a fellow gang member, Benny Hernandez, to continue threatening witnesses in his case. Romualdo based that opinion on Quezada's statements that "he [i.e., Vinnie] went to make sure that [inaudible] you know what I mean? . . . So, if you see that fool or you get word to him,

18

make sure he, he keeps it going." Romualdo testified that Quezada repeated that request later in the call, stating: "I told the short guy if he could, uhm, to ask you for something for me, because he's going to do something for me." According to Romualdo, Quezada's reference to the "short guy" was to "Vinnie," or Benny Hernandez. Quezada then told Barraza to get "a hold of" the "short guy" and "make sure that fool does it." Barraza replied, "Yeah, yeah, yeah, I already gave him an AK-47 and everything, so he . . . he . . . you know?" Quezada asked him, "[Y]ou already hooked that up for him?" Barraza replied, "Yeah, yeah." Quezada told him to "[g]et a hold of him. Tell him . . . to hook that up for and don't trip, man." Romualdo testified that conversation meant Quezada had provided Vinnie with a gun and told Barraza to contact him to keep the threat going.

On cross-examination, Romualdo conceded Quezada's reference to "Vinnie" could also have been to Vincent Verdusco, a Brole gang member who is related to Diane. However, even if that reference was to him, it did not change Romualdo's opinion that the recorded telephone call involved a threat.

The prosecutor argued the call should be admitted as circumstantial evidence to prove the gang enhancement because intimidation of witnesses and victims is one of the gang predicate offenses. It was also relevant to show Quezada's consciousness of guilt. Finally, it would be relevant to corroborate potential testimony by Pacheco that a Hispanic male came to his house, brandished a gun, and instructed him not to testify. Quezada's counsel argued the recorded call should be excluded because it was unintelligible without Romualdo's speculative interpretation. He also argued the prejudicial nature of the call outweighed its probative value. Mendivil's counsel joined in

19

those arguments and also argued the admission of evidence on Quezada's call would violate his constitutional right to confrontation of witnesses against him under the *Aranda/Bruton*[3] cases.

The trial court concluded there was a sufficient evidentiary foundation for Romualdo to testify as a gang expert regarding the meaning of the coded conversation between gang members. The court stated the defense could then argue whether his interpretation of the call was accurate. It further concluded the call evidence was admissible to show Quezada's gang affiliation to prove the gang enhancement, as well as his consciousness of guilt. Furthermore, if Pacheco testified he was intimidated, the call would be relevant to corroborate his testimony. Regarding Mendivil's *Aranda/Bruton* argument, the court stated a jury had already been selected for the joint trial and it could not "undo" that. Nevertheless, the court agreed to instruct the jury that Quezada's call was admissible only as to Quezada and it should not consider it for any purpose regarding Mendivil.

During the trial, the prosecution played the audio recording of Quezada's call to Barraza. Romualdo then testified regarding the call substantially as he had during the Evidence Code section 402 hearing. However, Pacheco did not testify that he had been threatened.

*Quezada's prior conviction*. During trial, the prosecution also sought to admit evidence of Quezada's prior conviction for unlawful possession of a firearm. That

---

3       *People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. U.S.* (1968) 391 U.S. 123.

conviction, along with three other convictions unrelated to Quezada or Mendivil, were offered to show the predicate offenses necessary for the gang allegations. Quezada objected to admission of his prior conviction, arguing that predicate offense was cumulative and highly prejudicial and the prosecution could use other predicate offenses unrelated to him or Mendivil to prove the gang allegations. Although Mendivil agreed evidence on Quezada's prior conviction was relevant to prove the gang allegations, he argued it should be excluded because there were other predicate offenses available for use by the prosecution.

Before the trial court ruled on the admissibility of evidence on Quezada's prior conviction, all of the parties stipulated to its admission and the language to be used to inform the jury of their stipulation. Thereafter, the prosecutor read the parties' stipulation to the jury, stating:

> "The People and defendant stipulate that [Quezada] has a felony conviction for a violation of Penal Code section 1202.1, unlawful possession of a firearm in the Superior Court of California, County of Imperial on July 10th, 2009."

The prosecutor also presented evidence on three other predicate offenses committed by Brole gang members (i.e., Brian Perez's 2010 second degree robbery conviction, Barraza's 2010 vehicle theft conviction, and Barraza's 2010 conviction for unlawful possession of a firearm by a felon).

B

Mendivil asserts the trial court erred by admitting evidence on Quezada's recorded jail telephone call because that evidence improperly implicated him in violation of the

21

*Aranda/Bruton* cases and his constitutional right to confront witnesses against him. We disagree.

Under the federal and California Constitutions, a criminal defendant is guaranteed the right to confront and cross-examine witnesses against him or her. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Pointer v. Texas* (1965) 380 U.S. 400, 403-405; *People v. Anderson* (1987) 43 Cal.3d 1104, 1119.) *People v. Aranda, supra,* 63 Cal.2d 518 and *Bruton v. U.S., supra,* 391 U.S. 123 generally hold that a nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant is unreliable and inadmissible as a violation of that defendant's constitutional right of confrontation and cross-examination. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1176.) However, since *Aranda* and *Bruton* were issued, the United States Supreme Court has clarified that the confrontation clause of the Sixth Amendment applies only to "testimonial" hearsay statements. (*Crawford v. Washington* (2004) 541 U.S. 36, 51-53, 68; *Davis v. Washington* (2006) 547 U.S. 813, 821-825.) Accordingly, the confrontation clause does not apply to nontestimonial hearsay statements, including those by a codefendant. (*Whorton v. Bockting* (2007) 549 U.S. 406, 420; *People v. Arceo* (2011) 195 Cal.App.4th 556, 571.) For example, an inmate's surreptitiously recorded jailhouse conversation that does not involve law enforcement interrogation is not testimonial. (*People v. Arauz* (2012) 210 Cal.App.4th 1394, 1401-1402; cf. *Davis v. Washington,* at p. 828 [recorded 911 call was to enable police to assist emergency and was not testimonial]; *People v. Cervantes* (2004) 118 Cal.App.4th 162, 173-174 [codefendant's statements to long-time friend were nontestimonial].) Although *Crawford* did not, and

22

subsequent United States Supreme Court and California Supreme Court cases have yet to, expressly overrule or limit the *Aranda/Bruton* holdings, it seems clear that the Sixth Amendment confrontation clause applies only to *testimonial* hearsay statements. (*Arceo*, at p. 575; *People v. Loy* (2011) 52 Cal.4th 46, 66; *People v. Gutierrez* (2009) 45 Cal.4th 789, 812; *Whorton*, at p. 420; *Davis*, at p. 821.)

In this case, Mendivil does not argue, nor could he reasonably argue, that Quezada's extrajudicial statements during his recorded jail telephone conversation with Barraza were "testimonial" statements. None of Quezada's statements were made under circumstances that would lead an objective witness to reasonably believe the statements would be available for use at a later trial. (*Crawford v. Washington*, *supra*, 541 U.S. at pp. 51-53; *Davis v. Washington, supra,* 547 U.S. at pp. 821-825.) Because Quezada and Barraza spoke in code, Quezada could not have reasonably expected his statements would be used at his (or Mendivil's) trial even though he had been warned his jail call may be recorded. (Cf. *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 309-310; *People v. Loy*, *supra*, 52 Cal.4th at pp. 66-67.) Accordingly, admission of evidence on Quezada's recorded call did not violate Mendivil's Sixth Amendment right to confrontation and cross-examination or the *Aranda/Bruton* holdings, as implicitly limited by *Crawford* and its progeny.

In any event, none of Quezada's extrajudicial statements *facially* inculpated Mendivil. Neither Quezada nor Barraza made any reference to Mendivil during the recorded call and Romualdo did not testify that Mendivil was referred to in that call. Because the *Aranda/Bruton* rule does not apply to confessions or other inculpatory

23

statements that are not incriminating on their face, admission of evidence on Quezada's recorded call did not violate that rule as to Mendivil. (*Richardson v. Marsh* (1987) 481 U.S. 200, 207-208; *People v. Hajek and Vo*, *supra*, 58 Cal.4th at pp. 1176-117.) Contrary to Mendivil's apparent assertion, the fact that both Quezada and Mendivil were charged with the same offenses for the benefit of the same gang did not make Quezada's statements during his recorded call facially inculpatory of Mendivil.

Furthermore, Mendivil does not argue that Quezada's extrajudicial statements during his recorded jail telephone conversation were inadmissible hearsay under our rules of evidence. Evidence Code section 1230 provides that statements made against the declarant's penal interest are not made inadmissible by the hearsay rule. Based on Romualdo's testimony interpreting Quezada's coded jail telephone call, the trial court could reasonably, and presumably did, conclude Quezada's statements were sufficiently reliable as against his penal interest because he instructed Barraza to contact Vinnie to ensure he would continue threatening or intimidating witnesses in his case. (Cf. *People v. Arceo*, *supra*, 195 Cal.App.4th at pp. 576-577; *People v. Cervantes*, *supra*, 118 Cal.App.4th at p. 177; *People v. Greenberger* (1997) 58 Cal.App.4th 298, 334-335.)

C

Mendivil also asserts the trial court erred by admitting evidence on Quezada's recorded jail telephone call because that evidence was not relevant to prove the offenses charged against Quezada and that the recorded call, by itself, was "largely incomprehensible" and was made relevant only by Romualdo's "speculation" regarding its meaning.

24

" 'Relevant evidence' " is evidence that has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)  In criminal cases, evidence is relevant if it "tends logically, naturally, and by reasonable inference to establish any fact material for the prosecution or to overcome any material matter sought to be proved by the defense.  [Citation.]  Evidence is relevant when no matter how weak it may be, it tends to prove the issue before the jury." (*People v. Slocum* (1975) 52 Cal.App.3d 867, 891.)  Only relevant evidence is admissible (Evid. Code, § 350), and all relevant evidence is admissible except as otherwise provided by statute (Evid. Code, § 351).  On appeal, we review a trial court's rulings on the relevance of evidence for abuse of discretion.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1195.)  A court has no discretion to admit irrelevant evidence.  (*People v. Alexander* (2010) 49 Cal.4th 846, 904.)

Contrary to Mendivil's assertion, we conclude the trial court properly found Quezada's recorded jail call to Barraza was relevant to prove the charges against Quezada.  Assuming the court properly allowed Romualdo to provide expert testimony in explaining the coded conversation (which issue we address below), the court could reasonably conclude the recorded call, along with Romualdo's expert testimony, would be probative on the issues of whether Quezada committed the charged offenses of premeditated attempted murder and assault with a deadly weapon, and the truth of the allegations he committed those offenses for the benefit of a criminal street gang and personally inflicted GBI.  The court could conclude that evidence would be probative in showing his identity as one of Pineda's attackers, his participation in a criminal street

25

gang, and his consciousness of guilt of those charged offenses. Furthermore, based on Quezada's instructions to Barraza that he contact Vinnie and ensure he continued his threats or intimidation against the eyewitnesses, the court could conclude that evidence would help explain the trial testimony provided by Pineda, Diane, and Monique to the extent it was inconsistent with their extrajudicial statements to Romualdo. (Cf. *People v. Vines* (2011) 51 Cal.4th 830, 867.) To the extent Quezada's call was difficult to comprehend or otherwise ambiguous, Romualdo's expert opinion on the meaning of Quezada's call was admitted to help the jury understand it. To the extent any ambiguity remained, it was the jury's function to weigh the evidence and determine the meaning and import of that call.

## D

Mendivil also asserts the trial court erred by allowing Romualdo to provide his expert opinion regarding the meaning of Quezada's recorded jail telephone call. Expert opinion testimony is admissible if the subject matter is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a); *People v. Gardeley* (1996) 14 Cal.4th 605, 617.) In particular, "[t]he subject matter of the culture and habits of criminal street gangs" is sufficiently beyond common experience so expert opinion testimony would be admissible. (*Gardeley*, at p. 617.) Accordingly, gang expert testimony has been properly admitted on "the size, composition or existence of a gang [citations], gang turf or territory [citations], an individual defendant's membership in, or association with, a gang [citations], the primary activities of a specific gang [citations], motivation for a particular crime, generally

26

retaliation or intimidation [citations], [and] whether and how a crime was committed to benefit or promote a gang [citations] . . . ." (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 657.) Furthermore, "[t]estimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (Evid. Code, § 805; *People v. Prince* (2007) 40 Cal.4th 1179, 1227 [opinion testimony may encompass ultimate issues].)

In this case, the trial court properly allowed Romualdo to testify as a gang expert and express his opinion regarding the meaning of the coded telephone conversation between Quezada and Barraza. The court could reasonably conclude the meaning of that conversation was sufficiently beyond common knowledge that Romualdo's expert opinion on its meaning could be helpful to the jury in understanding it. (Cf. *People v. Gamez* (1991) 235 Cal.App.3d 957, 964-965 [expert testimony was properly allowed on gang graffiti, hand signals, and dress].) Contrary to Mendivil's assertion, Romualdo's expert testimony was not made inadmissible because he testified regarding Quezada's knowledge and intent. Rather, Romualdo was permitted to testify regarding ultimate issues. (Evid. Code, § 805; *People v. Prince*, *supra*, 40 Cal.4th at p. 1227.) In any event, he did not provide any expert testimony of Quezada's guilt on the charged offenses. (Cf. *People v. Vang* (2011) 52 Cal.4th 1038, 1048.) The court properly allowed Romualdo to provide his expert opinion testimony on the meaning of Quezada's recorded jail telephone call.

27

E

Mendivil also asserts the trial court erred by admitting evidence of Quezada's prior conviction. However, as discussed above, the court did not make any ruling on Quezada's and/or Mendivil's objection to admission of that evidence. Rather, the parties stipulated to its admissibility before the court made a ruling. To the extent the evidence was erroneously admitted, Mendivil forfeited or invited that error and cannot now challenge it on appeal. (Evid. Code, § 353; *People v. Lucero* (2000) 23 Cal.4th 692, 723; *People v. Demetrulias* (2006) 39 Cal.4th 1, 21; *People v. Lewis* (2008) 43 Cal.4th 415, 481; *People v. Valdez* (2012) 55 Cal.4th 82, 143.)

Assuming arguendo Mendivil did not forfeit or invite the purported error, we nevertheless conclude the trial court properly admitted evidence of Quezada's prior conviction for unlawful possession of a firearm as a fourth predicate offense to prove the gang allegation. For a section 186.22, subdivision (b), gang enhancement to apply, the jury must find that one of the alleged criminal street gang's primary activities is the commission of one or more of certain predicate crimes listed in that statute and that the gang members engage in, or have engaged in, a pattern of criminal gang activity. (CALCRIM No. 1401; *People v. Gardeley, supra,* 14 Cal.4th at pp. 616-617.) A "pattern of criminal gang activity" may be shown by the commission of two or more of the predicate offenses listed in section 186.22, subdivision (e). (§ 186.22, subds. (e), (f); CALCRIM No. 1401; *Gardeley*, at pp. 616-617.) A defendant's prior conviction for a listed offense qualifies as a "predicate offense" for purposes of establishing a pattern of criminal gang activity. (*People v. Tran* (2011) 51 Cal.4th 1040, 1046.) Quezada's prior

28

conviction for unlawful possession of a firearm qualified as a predicate offense and was relevant to prove Brole was a criminal street gang within the meaning of section 186.22, subdivisions (b) and (f). Furthermore, his prior conviction was also relevant to prove Quezada actively participated in a criminal street gang (i.e., Brole) and knew Brole engaged in a pattern of criminal street activity. (*Tran,* at p. 1048.)

Mendivil argues the trial court nevertheless should have excluded evidence of Quezada's prior conviction under Evidence Code section 352 because its probative value was outweighed by its probable prejudicial effect. He argues that because the prosecution introduced evidence of three other predicate offenses, evidence of Quezada's prior conviction was cumulative and therefore its prejudice outweighed its probative value. However, Mendivil does not cite, and we are unaware of, any authority holding that the prosecution is limited to introducing evidence of no more than three predicate offenses or cannot introduce evidence of a defendant's or codefendant's prior conviction of a predicate offense. We believe there is no absolute limitation on the number of predicate offenses the prosecution may introduce. Instead, evidence of predicate offenses introduced by the prosecution is limited only by its probative value and the trial court's exercise of its discretion to exclude that evidence under Evidence Code section 352. Based on our review of the record in this case, we cannot conclude the trial court abused its discretion by allowing the prosecution to introduce evidence of Quezada's prior conviction for unlawful possession of a firearm. Although the prosecution introduced evidence of three other predicate offenses committed by other gang members, evidence of Quezada's prior conviction showed not only that Brole had a pattern of criminal street

29

activity, but also that Quezada actively participated in Brole and knew it engaged in a pattern of criminal street activity. (*People v. Tran*, *supra*, 51 Cal.4th at p. 1048.) Furthermore, the court could reasonably conclude that the probative value of that evidence outweighed its probable prejudicial effect. (Cf. *Tran*, at p. 1050.) The court could reasonably conclude any potential prejudicial effect on Mendivil was minimal because he was not involved in that prior offense by Quezada and the mere fact he was being jointly tried with Quezada would not lead the jury to attribute that prior conduct to him. Furthermore, the court gave a limiting instruction regarding the jury's use of evidence of Quezada's prior conviction, stating the jury could not conclude from that evidence that the defendant is a person of bad character or has a disposition to commit crime. The court properly admitted evidence of Quezada's prior conviction for possession of a firearm. *People v. Hendrix* (2013) 214 Cal.App.4th 216 and the other cases cited by Mendivil are factually inapposite to this case and do not persuade us to reach a contrary conclusion.

Mendivil also argues he was denied effective assistance of counsel when his counsel did not object to admission of evidence of Quezada's prior conviction. However, we conclude that, had his counsel objected to admission of that evidence and the trial court overruled that objection, the prejudicial effect of that evidence on Mendivil was minimal, at most, and therefore it is not reasonably probable he would have obtained a more favorable outcome had that evidence been excluded. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688; *People v. Frye* (1998) 18 Cal.4th 894, 979.)

30

IV

*Denial of Continuance*

Mendivil contends the trial court erred by denying his postverdict motion for a continuance to allow his defense counsel to investigate possible juror misconduct. He argues he showed good cause for a continuance based on a juror's affidavit regarding the jury's purported misunderstanding of the court's instructions.

A

On April 16, 2012, the jury returned its verdict convicting Mendivil of assault with a deadly weapon. On July 18, Mendivil filed a motion for release of juror identifying information. He argued that after the verdict was returned, his counsel and Quezada's counsel were informed by three jurors that they did not believe either Mendivil or Quezada personally attacked Pineda. In the supporting declaration of Mendivil's counsel, he stated the jurors did not believe the defendants personally inflicted great bodily injury, but instead found them guilty based on a theory of aiding and abetting as argued by the prosecutor. However, the jury was not instructed on aiding and abetting.

The prosecution opposed the motion, arguing Mendivil did not make a prima facie showing of good cause, did not specifically identify any of the jurors his counsel or Quezada's counsel spoke with, and did not show diligent efforts were made to contact jurors through other means. Importantly, the prosecution also argued Evidence Code section 1150, subdivision (a), barred admission of evidence on the subjective reasoning processes of jurors and that is what Mendivil sought to discover.

On August 3, the trial court found Mendivil made a sufficient showing to warrant a hearing to show cause why the identifying information for the three jurors should not be provided to him and, if testimony of those three jurors supported his contention, that it would then consider disclosing the identifying information for the remaining jurors. On August 29, the court held a hearing to show cause why the identifying information of the three jurors should not be provided to Mendivil. The court apparently provided Mendivil's counsel with the names, addresses, and telephone numbers of the three jurors.[4] The court also continued Mendivil's sentencing hearing until September 26, presumably to allow his counsel to investigate the alleged juror misconduct.

At the scheduled September 26 sentencing hearing, the trial court continued Quezada's sentencing because his counsel was not present. The court allowed Mendivil's counsel to lodge a declaration from Juror No. 3, in which she stated the jurors misunderstood the instructions on whether Mendivil and Quezada personally inflicted great bodily injury on Pineda. She stated in part:

> "Once the trial was concluded and prior to all deliberations the jury agreed to apply the jury instruction as to Penal Code [section] 245[, subdivision] (a)(1), which did not require the Defendant's [sic] to personally attac[k] the victim, as to all charges and allegations, including the [section] 1202.7 [sic] allegation of Great Bodily Injury. [¶] . . . [¶] . . . As to the Penal Code [section] 12022.7 allegation, I understood that I could find the allegation true, even though I did not feel that either of the defendants personally used a deadly weapon. I did not use the jury instruction for [section] 12022.7 and neither did any of the other jurors. We applied the instruction from Penal Code

4    Although the record on appeal does not contain a transcript of that hearing, subsequent proceedings in the record show the court took that action.

32

[section] 245[, subdivision] (a)(1) to the [section] 12022.7
allegation. We did so based upon the District Attorney's statement
that a person could be guilty . . . of all the charged offenses even
though they did not personally participate in the attack. Using the
statement from the District Attorney and applying the instruction
from Penal Code [section] 245[, subdivision] (a)(1), I found the
allegation true."

Mendivil's counsel represented to the court that he had tried to contact Juror No. 1 to ascertain whether that juror would corroborate Juror No. 3's statements, but was unsure whether he would cooperate. Accordingly, he requested a two-week continuance to allow him additional time to contact Juror No. 1.

The prosecution opposed a continuance of Mendivil's sentencing, arguing the statements in the declaration of Juror No. 3 were inadmissible under Evidence Code section 1150 and the possibility that another juror might corroborate those inadmissible statements was insufficient to show good cause for a continuance. The trial court found Mendivil had not shown good cause for a continuance and proceeded to sentence him.

B

A trial court has broad discretion in ruling on motions for continuance of sentencing and new trial. (*People v. Smithey* (1999) 20 Cal.4th 936, 1011-1012.) We review a court's denial of a motion for continuance for abuse of discretion. (*People v. Jones* (1998) 17 Cal.4th 279, 318.)

If a party does not comply with the requirements of section 1050 (i.e., written notice of motion filed and served at least two days before hearing), the trial court must deny the motion unless the party shows good cause. (*People v. Smithey*, *supra,* 20 Cal.4th at pp. 1011-1012.) In ruling on a motion for continuance, the court " ' "must

consider not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on . . . witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion." ' " (*People v. Fudge* (1994) 7 Cal.4th 1075, 1105-1106.) The court may also consider the diligence exercised by trial counsel. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037-1040.) A party is denied due process if the trial court's denial of a continuance is arbitrary under the circumstances of the case. (*People v. Frye, supra*, 18 Cal.4th at pp. 1012-1013; *Smithey*, at p. 1011-1012.)

C

Based on our review of the record, we conclude the trial court did not abuse its discretion by denying Mendivil's motion for continuance. The court reasonably concluded Mendivil did not show good cause for a continuance because the information his counsel sought to ascertain with further investigation related to the subjective thought processes of jurors.

"Evidence of jurors' internal thought processes is inadmissible to impeach a verdict." (*Bell v. Bayerische Motoren Werke Aktiengesellschaft* (2010) 181 Cal.App.4th 1108, 1124.) Evidence Code section 1150, subdivision (a), provides:

> "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. *No evidence is admissible* to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or *concerning the mental processes by which it was determined*." (Italics added.)

34

"Juror declarations are admissible to the extent that they describe overt acts constituting jury misconduct, but they are inadmissible to the extent that they describe the effect of any event on a juror's subjective reasoning process. [Citation.] Accordingly, juror declarations are *inadmissible* to the extent that they purport to *describe the jurors' understanding of the instructions or how they arrived at their verdict.* " (*Bell*, at pp. 1124-1125, italics added; see *People v. Allen and Johnson* (2011) 53 Cal.4th 60, 75 ["a court cannot consider evidence of a juror's subjective reasoning process in deciding whether to grant a new trial based on purported juror misconduct"]; *People v. Steele* (2002) 27 Cal.4th 1230, 1261 [evidence of how a juror understood the trial court's instructions is not competent].) In short, "the jurors' subjective thought processes [are] immaterial and of no jural consequence." (*People v. Hill* (1992) 3 Cal.App.4th 16, 30.) Therefore, evidence showing the jurors misunderstood the trial court's instructions "is simply of no legal significance." (*Ibid*.) Alternatively stated, "evidence about a jury's 'subjective *collective* mental process purporting to show *how* the verdict was reached' is inadmissible to impeach a jury verdict. [Citation.] Thus, juror declarations are inadmissible where, as here, they 'at most suggest "deliberative error" in the jury's collective mental process—confusion, misunderstanding, and misinterpretation of the law.' " (*Mesecher v. County of San Diego* (1992) 9 Cal.App.4th 1677, 1683.)

    In moving for a continuance of the sentencing hearing, Mendivil argued his counsel needed additional time to investigate possible misunderstanding of the trial court's instructions by jurors in deliberating and reaching a verdict. However, the object

35

of Mendivil's investigation (i.e., purported juror misconduct based on misunderstanding of the instructions) could not have resulted in any admissible evidence under Evidence Code section 1150, subdivision (a), and relevant case law, and it could not have supported a motion for new trial based on purported juror misconduct. Any evidence of jurors' misunderstanding of instructions is both inadmissible and immaterial on the question of juror misconduct. The declaration of Juror No. 3 that Mendivil lodged with the trial court in support of his request for a continuance dealt with the purported misunderstanding of the court's instructions by that juror and other jurors. That declaration was inadmissible evidence not only to show juror misconduct, but also as support for Mendivil's motion for continuance. Furthermore, Mendivil's argument that he might be able to obtain similar declarations from other jurors if he had additional time to investigate could not support a continuance because those possible additional declarations would likewise be inadmissible under Evidence Code section 1150, subdivision (a). Absent any evidence showing Mendivil had, or could obtain, admissible evidence of juror misconduct, the trial court reasonably concluded he did not show good cause for a continuance and properly denied his motion.

V

*Ineffective Assistance of Counsel*

Mendivil alternatively contends that if his counsel did not sufficiently object, or sufficiently move, to preserve the issues of improper juror dismissal, erroneous admission of evidence, or improper denial of his motion for continuance, he was denied effective

36

assistance of counsel.[5]  However, because we dispose of those issues on grounds other than waiver, forfeiture, or procedural inadequacies, we need not, and do not, address his ineffective assistance of counsel claim.[6]

DISPOSITION

The judgment is affirmed.


McDONALD, J.

WE CONCUR:


HALLER, Acting P. J.


McINTYRE, J.

---

[5]     To the extent Mendivil also suggests his counsel may have performed deficiently by not requesting additional jury instructions or clarification of instructions on the GBI allegation, he has forfeited or waived that contention by not presenting any substantive legal analysis showing the instructions given in this case were inadequate or confusing and therefore we do not address the merits of that contention.  (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852; *Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699-700; *Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99.)

[6]     As discussed above, we have, however, discussed that issue to the extent it relates to the admission of evidence of Quezada's prior conviction.